IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| FRIENDS OF ANIMALS, | Case No. 6:17-cv-00860-AA |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| GREG SHEEHAN, in his official capacity as the Acting Director of the United States Fish and Wildlife Service, and THE UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the United States, | |
| Defendants. | |

AIKEN, District Judge:

Plaintiff Friends of Animals brings this suit against defendants, Greg Sheehan, in his official capacity, and The United States Fish and Wildlife Service ("FWS") alleging that permits and agreements made by FWS violate the Endangered Species Act ("ESA") and National Environmental Policy Act ("NEPA"). The contested FWS actions are part of an experiment to gain data on the relationship between Barred Owl removal and Northern Spotted Owl recovery. Both parties have filed cross motions for summary judgment. (docs. 39 and 42) For the reasons set forth herein, plaintiff's motion is denied, and defendants' motion is granted.

Page 1 – OPINION AND ORDER

## BACKGROUND

The Northern Spotted Owl is a threatened species that is reliant on the old growth and mature forests of the Pacific Northwest for its continued survival. The Spotted Owl was listed under the ESA in 1990, following decades of wide-scale industrial logging in the region. FWS designated critical habitat for the Spotted Owl in 1992, encompassing nearly 6.9 million forested acres in Oregon, Washington, and Northern California.

The Barred Owl is native to eastern North America but expanded its range into the Pacific Northwest over the past century. Barred Owls now outnumber Spotted Owls in many portions of their range. Barred Owls are not a threatened species and are invasive to the region. They compete with Spotted Owls for territory, and can even attack them, displacing Spotted Owls from their prime habitat.

The 2011 Recovery Plan for the Northern Spotted Owl determined that competition from Barred Owls for niche habitat was one of three primary threats to Spotted Owls and required immediate consideration. Action 29 of the Recovery Plan consists of "large-scale control experiments to assess the effects of Barred Owl removal on Spotted Owl site occupancy, reproduction, and survival." AR_023927. FWS issued its Final Environmental Impact Statement ("FEIS") for implementation of Recovery Action 29 in July 2013, and a Record of Decision ("ROD") in September 2013. The FEIS noted that all study areas under the preferred alternative contained nonfederal land, as much of the forest land in the region has a "checkerboard" ownership pattern, interspersing federal lands with privately held parcels and state-owned timber lots.

This litigation arose because FWS entered into Safe Harbor Agreements ("SHAs") with nonfederal landowners Roseburg Resources, Oxbow Timber I, Weyerhaeuser, and the Oregon

Department of Forestry ("ODF") in order to conduct the experiment. The experiment establishes designated removal areas, where FWS will actively remove Barred Owls from the habitat and observe if (or how many) Spotted Owls recolonize the area—as well as control areas, where FWS will merely monitor the populations of both species without intervention. The SHAs allow FWS to access these private landholder's properties for the purposes of data collection, as well as the lethal removal of Barred Owls, while shielding the landowners from increased ESA obligations if Spotted Owl populations rise as a result of Barred Owl removal.

FWS issued Enhancement of Survival Permits ("permits") to the landowners. These permits designate "baseline" areas, where resident Spotted Owls have been detected by FWS in the last three years, and do not allow any take in those areas. The permits also define "non-baseline" areas, where no resident Spotted Owls have been observed by FWS for at least three years, and permits take in those areas. However, the permits prohibit practices in the non-baseline areas that could threaten a nesting pair of Spotted Owls with viable young during the nesting the fledging season. These restrictions and take allowances will remain in force for 10 years for the timber companies, and 12 years for ODF.[1]

Between December 2015 and November 2016 the FWS issued a Biological Opinion ("BiOp") for each SHA and permit in accordance with Section 7 of the ESA. FWS determined that these actions would not put the Spotted Owl in jeopardy because the potential habitat loss in the non-baseline areas was small in comparison with the Spotted Owl's total habitat. FWS noted

---

[1] The ODF permit was made effective 9/23/2016—8/31/2028. AR_001352. Permit to Weyerhaeuser was issued effective 6/9/2016—8/31/2025. AR_002755. Permit to Roseburg Resources for the Coast Ranges study area was issued effective 09/01/2015—8/31/2025. AR_003279. Permit to Oxbow Timber I was issued effective 09/01/2015—8/21/2025. Permit to Roseburg Resources for the Klamath/Myrtle study area was issued December 6, 2016 but the effective dates were left blank. AR_000002.

Page 3 – OPINION AND ORDER

that the ODF permit would allow removal of critical habitat, but FWS determined this removal would not amount to adverse modification.

Plaintiff has challenged this program previously. It brought two unsuccessful lawsuits seeking to halt the Barred Owl removal experiment under the Migratory Bird Treaty Act. *See Friends of Animals v. Jewell*, 2014 WL 3837233 (E.D. Cal. Aug. 1, 2014); *Friends of Animals*, 2015 WL 4429147 (D. Or. July 16, 2015), *aff'd*, 879 F.3d 1000 (9th Cir. 2018), *cert denied*, No. 17-1426 (June 11, 2018). There, plaintiff's primary objection was to the killing of the Barred Owls. The background of this matter is also extensively covered in the previous opinions dismissing those cases.

Plaintiff filed the present complaint before this Court on June 2, 2017, on the theory that the SHAs and permits are unlawful under the ESA because the potential threat of critical habitat loss and Spotted Owl take in non-baseline areas outweighs any conservation benefit realized by the experiment. Plaintiff also alleges the NEPA analysis for these permits and agreements was insufficient and did not adequately consider the impacts of the critical habitat losses authorized by these permits. Thus, plaintiff requests this Court vacate the permits and SHAs, order supplementation to the NEPA documents, and enjoin the experiment.

## LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is inappropriate if a rational trier of fact, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving parties favor. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir.

2008). "The filing of cross-motions for partial summary judgment or summary judgment does not necessarily mean that the material facts are, indeed, undisputed." *Regents*, 507 F. Supp. 2d at 1077. "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir.2001).

## DISCUSSION

Before the merits can be reached in this motion, I must examine proper jurisdiction to hear the case under Article III. "A threshold question in every federal case is ... whether at least one plaintiff has standing." *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009) (citation and quotation marks omitted). To demonstrate standing, a plaintiff must show that (1) she suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that injury is fairly traceable to the defendant's challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). An organization has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of Animals v. Jewell*, 2014 WL 3837233, at *4 (citing *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir.2000))

To survive defendant's cross motion for summary judgment, a plaintiff must support each element of the standing test "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. In responding to a motion for summary judgment, a plaintiff

can no longer rest on "'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Id.*

The first prong of the standing analysis is injury in fact, which has three sub-requisites: the injury must be concrete, particularized, and actual or imminent. *Lujan*, 504 U.S. at 560. A plaintiff cannot demonstrate injury in fact by merely alleging injury to the environment; there must be an allegation that the challenged conduct is harming (or imminently will harm) the plaintiff. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). For example, a plaintiff may meet the injury in fact requirement by alleging the challenged activity "impairs his or her economic interests or aesthetic and environmental well-being." *Wash. Envt'l Council v. Bellon*, 732 F.3d 1131, 1140 (9th Cir. 2013) (quotation marks omitted and alterations normalized).

Neither of plaintiff's declarants has adequately pled injury-in-fact regarding the Klamath/Myrtle treatment area, so I dispose of that aspect of the claim at the outset.[2] As to the Coast Range study area and the permits and SHAs related to those private and state-owned lands designated as treatment areas, I find both declarations fail to identify a concrete interest or cognizable injury.

First, Marguery Lee Zucker, a resident of Eugene, Oregon, says in her sworn declaration "I personally have visited the Archie Knowles, Whittaker Creek, and North Fork Siuslaw Campgrounds, as well as surrounding areas within the Oregon Coast Ranges Study Area. I plan to visit one or more of these areas this summer, and expect that I will visit several of these

---

[2] Ms. Zucker says only generally that her "numerous travels across Douglas County for various camping and hiking expeditions have taken me through the Union/Myrtle (Klamath) Study Area as well, and I plan to return to these areas in Douglas County in the near future as well," Decl. M. Zucker at ¶ 6, which clearly fails the standing test of *Lujan* 504 U.S. at 560. Mr. Harris makes no specific mention of the Klamath/Myrtle area in either of his two declarations.

campsites within the next ten years." Decl. M. Zucker at ¶ 5. Defendants argue Ms. Zucker has no standing because she "never explicitly states that she has visited the SHA treatment areas" and the campgrounds she mentions "are not within any of the treatment areas." D. Mot. For Sum. J. at 20. Plaintiff counters that "the Archie Knowles campsite in which she [Zucker] has camped is within one half mile of a non-baseline treatment site on state lands covered by these SHAs (Brush Creek), and the Whittaker Creek campsite is approximately one mile from a different non-baseline treatment site (Meadow Creek)." P. Reply in Supp. Of Sum. J. at 32. Plaintiffs do not provide any additional detail about Ms. Zucker's specific history or future plans to view Spotted Owls in the treatment area of the study.

The second declarant is Michael Ray Harris, notably, plaintiff's lead litigator for this case.[3] A resident of Colorado, Mr. Harris visits Eugene, Oregon on a near-annual basis for the Public Interest Environmental Law conference, held at the University of Oregon School of Law. Incidental to this business travel, he "spend[s] time in the old-growth forests of Oregon." Decl. of M. Harris at ¶ 6. Specifically, Mr. Harris declares that he had plans to view parcels in treatment area, visible from the Nelson Mountain Road, in 2017 before the litigation was filed. *Id.* at ¶ 7-8. Although these plans did not materialize in 2017, he did drive on Nelson Mountain road in March 2018, after the present complaint was filed, to look for Spotted Owls with his young son, and plans to do this again in 2019. *Id.*

---

[3] The Court has set aside lengthy analysis of the weighting of this declaration because the entire action fails on standing. However, in the Ninth Circuit it is generally disfavored for a litigation attorney to serve as a witness in a case where she also serves as counsel. *See e.g., Lau Ah Yew v. Dulles*, 257 F.2d 744, 746-47 (9th Cir. 1958) ("It is usually inappropriate for an attorney connected with the trial of a case to testify in behalf of his client. He should ordinarily withdraw before becoming a witness...an attorney who assumes the burden of a witness while representing his client in a lawsuit does so at a very great detriment to the credibility of his testimony.")

Page 7 – OPINION AND ORDER

Plaintiff offers these two declarations as evidence that it has concrete interests in the FWS-issued permits and SHAs with the landowners of these parcels. Plaintiff further argues that the declarants' history of recreating in this area, and plans for future use, particularize the injury. *See Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000) ("Repeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person.")

Plaintiff argues that the declarants' viewing of the forests from public roads and campsites aligns with this Court's recent holding that "interest in observing the forest and wildlife on private land, from a publicly accessible vantage point, is sufficient to confer standing," *Cascadia Wildlands v. Scott Timber Co.*, 190 F. Supp. 3d 1024, 1031 (D. Or. 2016), (citing *Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir. 2001)) ("[W]e have never required a plaintiff to show that he has a right of access to the site on which the challenged activity is occurring, or that he has an absolute right to enjoy the aesthetic or recreational activities that form the basis of his concrete interest. If an area can be observed and enjoyed from adjacent land, plaintiffs need not physically enter the affected area to establish an injury in fact.")

Plaintiff misreads *Cascasdia Wildlands*; the injuries alleged there are not the injuries alleged here. Even if this Court were to read plaintiff's declarations generously, as evidence of a concrete and particular interest in viewing Spotted Owls on the non-pubic lands covered by these agreements and permits, the requirement of an actual and imminent injury to that interest is simply not met. In *Cascadia Wildlands*, a parcel in Oregon's Elliott State Forest was about to be logged by a private timber company, and the tract was allegedly occupied by endangered Marbled Murrelets. Plaintiffs accordingly sought and secured temporary injunctive relief

pursuant to an ESA Section 9 citizen suit, because there was an imminent threat of unlawful take by the defendant. *Id.* at 1029, 1037.

Here, plaintiff has a generalized grievance that the SHAs and permits will allow take of theoretical Spotted Owls on the lands at issue at some future time. *Lujan* clearly requires an injury that is not "conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. An injury that happens only when and if Spotted Owls occupy non-baseline areas – areas that, by definition, the FWS has determined are not currently occupied by resident Spotted Owls – is not an actual or imminent injury.

Plaintiff also fails on causation and has not demonstrated that any injury alleged is "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citation and quotation marks omitted). There is no imminent threat to Spotted Owls by the FWS; in fact, FWS has ensured that ESA protections remain in force for the resident Spotted Owls in the baseline zones, and that any pair of Spotted Owls that move into the non-baseline areas are protected while they nest and fledge their owlets.

Plaintiff objects to lethal removal of the invasive Barred Owls and does not agree that take permits for Spotted Owls are appropriate under these circumstances, but their action fails the test of standing. Further, evidence in the record suggests to this Court that the conduct of FWS is well within the bounds of ESA Section 10, undertaken pursuant to Action 29 in the Northern Spotted Owl Recovery Plan, and that the NEPA analysis was lawfully executed by FWS, and so the action would likely also fail on merits. Nevertheless, the Court need not reach the merits as plaintiff has failed to establish standing to bring the present action. Thus, defendants are entitled to summary judgment in their favor.

## CONCLUSION

Plaintiff's Motion for Summary Judgment (doc. 39) is DENIED. Defendant's Cross-Motion for Summary Judgment (doc. 42) is GRANTED.[4] Accordingly, this case is dismissed. IT IS SO ORDERED.

Dated this 11th day of December 2018.

*Ann Aiken*
Ann Aiken
United States District Judge

---

[4] Because the Court has found the plaintiff's lack standing, even when accepting Mr. Harris's declaration, the Court need not address defendant's request to strike the declaration.