IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

FRIENDS OF ANIMALS,

        Plaintiff,

   v.

GREG SHEEHAN, in his official capacity as the Acting Director of the United States Fish and Wildlife Service, and THE UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the United States

        Defendants,

Case No.  6:17-cv-00860-AA
**OPINION AND ORDER**

_____

AIKEN, District Judge:

     Plaintiff Friends of Animals ("FOA") brings this suit against defendants, Greg Sheehan, in his official capacity, and the United States Fish and Wildlife Service

Page 1 – OPINION AND ORDER

("FWS") alleging that Permits and Safe Harbor Agreements ("SHAs) made by FWS violate the Endangered Species Act ("ESA") and National Environmental Policy Act ("NEPA"). The contested FWS actions are part of an experiment to gain data on the relationship between Barred Owl removal and Northern Spotted Owl recovery. Both parties have filed cross motions for summary judgment. Docs. 55 and 56. For the reasons set forth herein, plaintiff's motion is DENIED, and defendants' motion is GRANTED.

## BACKGROUND

The Northern Spotted Owl is a threatened species that is reliant on the old growth and mature forests of the Pacific Northwest for its continued survival. The Spotted Owl was listed under the ESA in 1990, following decades of wide-scale industrial logging in the region. FWS designated critical habitat for the Spotted Owl in 1992, encompassing nearly 6.9 million forested acres in Oregon, Washington, and Northern California. The Barred Owl is native to eastern North America but expanded its range into the Pacific Northwest over the past century. Barred Owls now outnumber Spotted Owls in many portions of their range. Barred Owls are not a threatened species and are invasive to the region. They compete with Spotted Owls for territory, and can even attack them, displacing Spotted Owls from their prime habitat.

The 2011 Recovery Plan for the Northern Spotted Owl determined that competition from Barred Owls for niche habitat was one of three primary threats to Spotted Owls and required immediate consideration. Action 29 of the Recovery Plan

consists of "large-scale control experiments to assess the effects of Barred Owl removal on Spotted Owl site occupancy, reproduction, and survival." *AR 015636.* FWS issued its Final Environmental Impact Statement ("FEIS") for implementation of Recovery Action 29 in July 2013, and a Record of Decision ("ROD") in September 2013. The FEIS noted that all study areas under the preferred alternative contained nonfederal land, as much of the forest land in the region has a "checkerboard" ownership pattern, interspersing federal lands with privately held parcels and state-owned timber lots.

This litigation arose because FWS entered into SHAs" with nonfederal landowners Roseburg Resources, Oxbow Timber I, Weyerhaeuser, and the Oregon Department of Forestry ("ODF") in order to conduct the experiment. The experiment establishes designated removal areas, where FWS will actively remove Barred Owls from the habitat and observe if (or how many) Spotted Owls recolonize the area-as well as control areas, where FWS will merely monitor the populations of both species without intervention. The SHAs allow FWS to access these private landholder's properties for the purposes of data collection, as well as the lethal removal of Barred Owls, while shielding the landowners from increased ESA obligations if Spotted Owl populations rise as a result of Barred Owl removal.

FWS issued Enhancement of Survival Permits ("Permits") to the landowners. These Permits designate "baseline" areas, where resident Spotted Owls have been detected by FWS in the last three years, and do not allow any take in those areas. The Permits also define "non-baseline" areas, where no resident Spotted Owls have

been observed by FWS for at least three years, and Permits take in those areas. However, the Permits prohibit practices in the non-baseline areas that could threaten a nesting pair of Spotted Owls with viable young during the nesting the fledging season. These restrictions and take allowances will remain in force for ten years for the timber companies and twelve years for ODF.

Between December 2015 and November 2016, the FWS issued a Biological Opinion ("Bi Op") for each SHA and permit in accordance with Section 7 of the ESA. FWS determined that these actions would not put the Spotted Owl in jeopardy because the potential habitat loss in the non-baseline areas was small in comparison with the Spotted Owl's total habitat. FWS noted that the ODF permit would allow removal of critical habitat, but FWS determined this removal would not amount to adverse modification.

Plaintiff has challenged this program previously. It brought two unsuccessful lawsuits seeking to halt the Barred Owl removal experiment under the Migratory Bird Treaty Act. *See FOA v. Jewell*, 2014 WL 3837233 (E.D. Cal. Aug. 1, 2014); *FOA*, 2015 WL 4429147 (D. Or. July 16, 2015), aff'd, 879 F.3d 1000 (9th Cir. 2018), cert denied, No. 17-1426 (June 11, 2018). There, plaintiff's primary objection was to the killing of the Barred Owls. The background of this matter is also extensively covered in the previous opinions dismissing those cases.

Plaintiff filed the present complaint before this Court on June 2, 2017, on the theory that the SHAs and Permits are unlawful under the ESA because the potential threat of critical habitat loss and Spotted Owl take in non-baseline areas outweighs

any conservation benefit realized by the experiment. Plaintiff also alleges the NEPA analysis for these Permits and agreements was insufficient and did not adequately consider the impacts of the critical habitat losses authorized by these Permits. Thus, plaintiff requests this Court vacate the Permits and SHAs, order supplementation to the NEPA documents, and enjoin the experiment.

This court dismissed Plaintiff's claim for lack of standing. (doc. 45). The Ninth Circuit reversed in part, recognizing that Plaintiffs did, in fact, have standing and remanded the case to this Court to decide the issue on the merits (doc. 51).

## STANDARD OF REVIEW

I.    *Motion for Summary Judgement*

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is inappropriate if a rational trier of fact, drawing all inferences in favor of the nonmoving patty, could return a verdict in the nonmoving parties favor. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). "The filing of cross-motions for partial summary judgment or summary judgment does not necessarily mean that the material facts are, indeed, undisputed." *Regents of Univ. of Cal. v. Micro Therapeutics, Inc.*, 507 F. Supp. 2d 1074, 1077 (N.D. Cal. 2007). "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material

identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).

## II.    *Administrative Procedural Act*

The Administrative Procedural Act ("APA") does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts. *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 555, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). An agency's decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The standard is deferential. The court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir.1987).

In conducting an APA review, the court must determine whether the agency's decision is "founded on a rational connection between the facts found and the choices made . . . and whether [the agency] has committed a clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1243 (9th Cir. 2001). "The [agency's] action . . . need only be a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed. v. Burford*, 871 F.2d 849, 855 (9th Cir.1989).

Plaintiff asserts that the SHAs and Permits the FWS issued to implement the Barred Owl removal experiment are arbitrary and capricious under the APA because

they violate the ESA and NEPA and their implementing regulations as well as the FWS' own policy and guidance regarding SHAs and permit issuance.

## DISCUSSION

I.    *ESA Claims*

Plaintiffs assert FWS violated the ESA by (1) issuing a permit that fails to achieve a "net conservation benefit," (2) failing to use the best biological and habitat information in forming baseline conditions, and (3) failing to analyze the SHA's effect on critical habitat.

A.    *Auer Deference*

To answer some of these legal questions, the Court considers the authorizing statute, implementing regulations, SHA Policy's definition of "net conservation benefit," and overall regulatory framework to determine whether the FWS' interpretation is entitled to deference under *Auer v. Robbins*, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997).

The Court agrees with Defendant that *Auer* deference is appropriate because the regulation at issue is ambiguous and that the FWS' determination was not plainly erroneous or inconsistent under the statute. Def.'s Mot. Summ. J. 26.

In determining the appropriate level of deference afforded to the agency, this Court addresses the statutory text of the ESA, the agencies' regulations construing it, and the FWS' SHA policy interpreting the regulations. *See Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 283, 129 S. Ct. 2458, 2472, 174 L. Ed. 2d 193 (2009).

Section 10(a)(1)(A) of the ESA authorizes the FWS Secretary to permit take of a listed species "for scientific purposes or to enhance the propagation or survival of the affected species[.]  16 U.S.C.A. § 1539.  Under this authority, FWS provides Safe Harbor assurances to nonfederal property owners that voluntarily conserve threatened and endangered species through issuance of an Enhancement of Survival Permit, which shields the nonfederal property owners from liability arising from take that is incidental to an otherwise lawful activity.  Announcement of Final Safe Harbor Policy, 64 Fed. Reg., 32,717, 32,718 (Jun. 17, 1999) ("[T]he Services have determined that the section 10(a)(1)(A) 'enhancement of survival' permit provisions provide the best mechanism to carry out a permanent Safe Harbor policy.")

To issue a permit authorizing incidental take in accordance with a SHA, the agreement must meet the following criteria:

i.    The take will be incidental to an otherwise lawful activity and will be in accordance with the terms of the Safe Harbor Agreement;

ii.   The implementation of the terms of the Safe Harbor Agreement is *reasonably expected to provide a net conservation benefit* to the affected listed species by contributing to the recovery of listed species included in the permit, and the Safe Harbor Agreement otherwise complies with the Safe Harbor policy available from the Service.

iii.  The probable direct and indirect effects of any authorized take will not appreciably reduce the likelihood of survival and recovery in the wild of any listed species;

iv.   Implementation of the terms of the Safe Harbor Agreement is consistent with applicable Federal, State, and Tribal laws and regulations;

v.    Implementation of the terms of the Safe Harbor Agreement will not be in conflict with any ongoing conservation or recovery programs for listed species covered by the permit; and

vi.   he applicant has shown capability for and commitment to implementing all of the terms of the Safe Harbor Agreement.

50 C.F.R. § 17.32(c)(2) (emphasis added).

"[W]here an agency interprets its own regulation, even if through an informal process, its interpretation of an ambiguous regulation is controlling under *Auer* unless 'plainly erroneous or inconsistent with the regulation.'" *Bassiri v. Xerox Corp.*, 463 F.3d 927, 930 (9th Cir. 2006) (quoting *Auer*, 519 U.S. at 461, 117 S.Ct. 905). However, a court should not review an agency's interpretation under *Auer* deference unless the regulation is genuinely ambiguous. *Amazon.com, Inc. v. Comm'r of Internal Revenue*, 934 F.3d 976, 992 (9th Cir. 2019). To determine whether the regulation is genuinely ambiguous, a "court must make a conscientious effort to determine, based on indicia like text, structure, history, and purpose, whether the regulation really has more than one reasonable meaning." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2423–24, 204 L. Ed. 2d 841 (2019).

The regulatory section governing SHAs requires that they comply with the requirements of the Safe Harbor policy. 50 C.F.R. § 17.32 (c)(1)(i). Accordingly, plaintiff contends that the Safe Harbor policy resolves the ambiguous net conservation benefit requirement by defining the term in its policy. However, the Safe Harbor policy is an interpretive document that does not carry the force of law. The Ninth Circuit established a two-part test for determining when agency pronouncements have the force and effect of law:

> To have the force and effect of law, enforceable against an agency in federal court, the agency pronouncement must (1) prescribe substantive rules—not interpretive rules, general statements of policy or rules of agency organization, procedure or practice—and (2) conform to certain procedural requirements.

*River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1071 (9th Cir. 2010) (quoting *United States v. Fifty–Three (53) Eclectus Parrots*, 685 F.2d 1131 (9th Cir.1982)).

In determining whether the policy prescribes substantive, rather than interpretive rules, courts consider the text of the policy and whether it creates substantive rights against third parties. *Id*. at 1071-72.

Here, the text of the Safe Harbor Policy prescribes interpretive rules. Specifically, the policy expressly states that "the purpose of this policy is to ensure consistency in the development of [SHAs]," implying the purpose of the document is to aid in interpretation and implementation. 64 Fed. Reg. at 32,706, 32,707 (June 17, 1999). The Safe Harbor Policy also does not impose substantive rights against third parties. Though the SHA imposes certain requirements, such as "provid[ing] a mechanism to allow landowners to terminate their voluntary Agreements before the expiration date," "establish[ing] specific public review periods," and how the FWS will "address neighboring property owners to non-Federal property owners who receive Safe Harbor assurances," these are considerations that merely provide internal guidance to the agency on provisions to incorporate in each SHA. 64 Fed. Reg. at 32,719, 32,721. Thus, the policy establishes provisions that should be incorporated in SHAs to ensure consistency—not substantive rights against third parties.

Thus, because the policy does not carry the force of law, it does not resolve the regulation's ambiguities. Accordingly, where the regulation is ambiguous, the FWS' determinations are controlling unless they are plainly erroneous or inconsistent with the regulation. Though the Safe Harbor policy does not carry the force of law, neither

party argues the policy is "plainly erroneous or inconsistent with the regulation," and the Court accepts it as correct. *See Coeur Alaska, Inc.*, 557 U.S. at 278. To that end, the Safe Harbor policy is instructive in determining whether the FWS' is consistent with the overall regulatory framework and implementation.

B.    *The Permits and SHAs Can Be Reasonably Expected to Provide a "Net Conservation Benefit."*

Plaintiff asserts that FWS violated the ESA and its implementing regulations because the SHAs and Permits at issue are not reasonably expected to provide a "net conservation benefit," as required by regulatory issuance criteria. 50 C.F.R. 17.32 (c)(2)(ii); Compl. ¶ 9*;* Pl.'s Mot. Summ. J. 15. In its argument, plaintiff contends that the SHAs violate the ESA because (1) an "informational benefit" is a conservation benefit that cannot result in a net conservation benefit, (2) the permittees are not undertaking any "management activities," and the (3) "SHAs will not result in an increase in the Spotted Owl population over the term of the SHAs," Pl.'s Mot. Summ. J. 16-17. Essentially, the issue rests on whether obtaining access to private owner's land and survey data to further an experiment in exchange for authorization of incidental take can be reasonably expected to provide a net conservation benefit under the permit's regulatory criteria.

As an initial matter, FOA asserts that the value of a potential contribution to long-term Barred Owl management through gathering information for experimental research in exchange for permitting incidental take cannot result in a net conservation benefit" Compl. ¶ 8-9. Because the net conservation benefit criterion is ambiguous, the FWS' determination that the value of an "informational benefit" in

exchange for permitting incidental take is controlling unless it is plainly erroneous or inconsistent with the regulation.

The implementing regulations requiring SHAs to "reasonably be expected to achieve a net conservation benefit" is ambiguous by itself. But, the Court finds the SHA policy instructive in determining whether an "informational benefit" in exchange for permitting incidental is plainly erroneous or inconsistent with the regulatory requirement to achieve a net conservation benefit. The SHA policy expressly lists the "establishment of areas to test and develop new and innovative conservation strategies" as an example of a potential conservation benefit. 64 Fed. Reg. at 32,723. This language clearly contemplates the use of SHAs with private landowners for the purpose of establishing testing areas and developing new and innovative conservation strategies.

Plaintiff maintains that the SHA "cannot be said to create an area for testing and implementing a new conservation strategy because the barred owl removal experiment is designed to 'gather information regarding the effects of barred owls on spotted owl . . . through experimental removal'" while allowing incidental take. Pl.'s Mot. Summ. J. 19. The Court fails to see how gathering information on the effectiveness of a conservation strategy differs from testing and developing new conservation strategies.

Moreover, the entire purpose of the SHAs is to provide an incentive for property owners to participate in conservation and management activities by shielding the landowner from liability if the owner causes take of a listed species that

was incidental to an otherwise lawful activity. 64 Fed. Reg. at 32,717-18 ("This final Safe Harbor policy encourages property owners to voluntarily conserve threatened and endangered species without the risk of further restrictions pursuant to section 9 of the Act."). Thus, the Court finds plaintiff's arguments unpersuasive and holds an "informational benefit" can be sufficient to attain a "net conservation benefit" for purposes of meeting the SHA's and Permit's regulatory criteria.

In addition to Permit issuance criteria, the regulatory section requires a permit applicant to provide "a description of how incidental take of the covered species pursuant to the [SHA] is likely to occur, both as a result of *management activities* and as a result of the return to baseline." 50 C.F.R. § 17.32(c)(1)(ii) (emphasis added). However, the regulatory section provides no guidance as to what constitutes a "management activity," rending the regulatory meaning ambiguous.

The Safe Harbor Policy reiterates this requirement and defines "management activities" as "voluntary conservation actions to be undertaken by a property owner that the Services believe will benefit the covered species." 64 Fed. Reg. at 32,722-23.

Plaintiff also argues that landowner's merely granting access to their land and survey data does not constitute a "management activity." Plaintiff's arguments are unpersuasive. Here, the property owners are voluntarily allowing access to their property and providing survey data to the FWS. Though the voluntary action indirectly benefits conservation, the Safe Harbor policy includes "indirect benefits" that may contribute to the conservation of a species as sufficient to constitute a conservation benefit. 64 Fed. Reg. at 32,720.

Further, and as previously discussed, an "informational benefit" can constitute a net conservation benefit.  Thus, property owners' voluntary actions, providing Spotted Owl survey data and access to their land for Barred Owl removal, are actions the Service believes will benefit the covered species by providing an "informational benefit."  Accordingly, the property owners' actions undertaken in each SHA are sufficient to constitute a "management activity."

Nevertheless, plaintiff attempts to draw from other language in the policy to create an inference that the SHA and Permits are arbitrary and capricious. Specifically, plaintiff asserts that the conservation benefit of the SHA and permit do not provide a net conservation benefit because the benefit is speculative, depending on the experiment's success, and will occur in the future rather during the SHA's term.  Pl.'s Mot. Summ. J. 19.  FOA relies on language in the policy stating that a "'net conservation benefit' means the cumulative benefits of the management activities identified in a [SHA] that provide for an increase in a species' population and/or the enhancement, restoration, or maintenance of covered species' suitable habitat within the enrolled property."  64 Fed. Reg. at 32,722; Pl.'s Mot. Summ. J. 11. Plaintiff maintains the potential future conservation benefit does not satisfy the SHAs definition because it neither provides an increase in species' population nor enhances, restores, or maintains Spotted Owl habitat.  Pl.'s Mot. Summ. J. 11.

The Court rejects plaintiff's reliance on policy language requiring the agreement to identify where and when the benefits would be achieved as an inference that the conservation benefit must be effective during the SHA and not afterward.

Pl.'s Mot. Summ. J. 18-19.  Permitting incidental take in exchange for the benefit of establishing test areas and developing new and innovative conservation strategies fits squarely with the policy and purpose of the regulatory scheme, despite the benefit potentially accruing after the SHA's terms.  Accordingly, a net conservation benefit arising from establishing areas to test and develop new and innovative conservation strategies through Barred Owl removal, in exchange for authorizing incidental take, is not plainly inconsistent or erroneous with the regulation.

For the reasons discussed, the FWS was not plainly erroneous or inconsistent with the regulatory scheme in finding the SHAs and Permits at issue are reasonably expected to provide a net conservation benefit.

C.    *FWS Sufficiently Described the Baseline Conditions of Properties Subject to the SHAs.*

The regulatory issuance criteria for the SHA provides no mandates or guidance on establishing baseline conditions.  Accordingly, the FWS' decision is reviewed under *Auer* deference and refers to the Safe Harbor Policy for guidance in determining whether the FWS's calculation of the baseline sites was "plainly erroneous or inconsistent" with the regulation.

According to the Safe Harbor Policy, baseline conditions are "population estimates and distribution and/or habitat characteristics and determined area of the enrolled property that sustain seasonal or permanent use by the covered species at the time the [SHA] is executed between the Services and the property owner."  64 Fed. Reg. at 32,722.  The purpose of establishing baseline conditions is to "determine the degree of occupancy of the enrolled lands by covered species."  64 Fed. Reg. at

32,724. Once baseline conditions are established, the FWS provides assurances that authorize the property owner to use the property in any manner, even if it results in incidental take of a listed species, as long as the landowner acts in compliance with SHA provisions and the enrolled property does not fall below baseline conditions. 64 Fed. Reg. at 32,724.

The policy provides little guidance on how baseline conditions should be determined. Besides general mandates that require the FWS to use population numbers of listed species or occupied habitat acreage or both, the SHA policy does not require particular methodologies or survey techniques in calculating its baseline. 64 Fed. Reg. at 32,724.

The policy does, however, emphasize that the parties to the SHA must "identify and agree on the degree to which the enrolled property is inhabited, permanently or seasonally, by the covered species." 64 Fed. Reg. at 32,723. It then discusses a degree of flexibility, allowing the FWS to either "review and concur" with the property owner's determination and "if necessary, conduct on-site visits," or "incorporate information provided by the property owner" when formulating baseline conditions. 64 Fed. Reg. at 32723. Also, as plaintff points out, it requires the estimate to be based on "best available techniques and information," and discusses "on-site inspections, maps, aerial photographs, remote sensing, or other similar means" as appropriate methods for determining baseline conditions. 64 Fed. Reg. at 32,723.

In the SHAs at issue, FWS delineated "baseline" and "non-baseline" conditions, establishing sites as non-baseline if no residential territorial breeding pairs had been

sighted in the area in the last three years to five years (with length of sighting time varying in each SHA). *AR 001366-69 (ODF); AR 003295-97 (RRC/Oxbow); AR 000019 (RRC); AR 002771-73 (Weyerhaeuser).* In contrast, sites were considered baseline sites if survey data showed presence of Spotted Owls in the last three to five years. *Id.*

In effect, the Permits at issue go beyond the Safe Harbor Policy's recommended protections, which expressly permits incidental take to the extent the take would not dip the population or habitat below baseline conditions. 64 Fed. Reg. at 32,723 ("[The SHA] assurances allow the property owner to alter or modify enrolled property, even if such alteration or modification results in the incidental take of a listed species to such an extent that it returned the species back to the originally agreed upon baseline conditions.").

Here, rather than permitting incidental take of Spotted Owls to the extent that would return the property to baseline conditions in sites where Spotted Owls have been surveyed, the permit's incidental take authorization is more restrictive because it only authorizes incidental take in non-baseline sites. *AR 001350 (ODF)* ("Once all issuance requirements are met, ODF would receive a permit that authorizes incidental take of spotted owls that reoccupy currently unoccupied sites (defined below) as a result of the removal of barred owls under the experiment, should such take be likely to occur through future planned forest management activities during the permit term."); *AR 003286 (RRC/Oxbow)* ("RRC and Oxbow will receive a permit that authorizes incidental take of any spotted owls that reoccupy currently

unoccupied sites as a result of the removal of barred owls under the experiment."); *AR 000009 (RRC)* ("RRC will receive a permit that authorizes incidental take of any spotted owls that reoccupy currently unoccupied (non-baseline) sites as a result of the removal of barred owls under the Experiment."); *AR 002762 (Weyerhaeuser)* ("Weyerhaeuser will receive a permit that authorizes incidental take of any spotted owls that reoccupy currently unoccupied sites as a result of the removal of barred owls under the experiment."). Thus, property owners are only authorized to incidentally take Spotted Owls on sites that have not shown the presence of the listed species for the length of time established in each SHA.

Plaintff asserts the FWS violated the ESA in calculating its baseline conditions because it (1) knowingly based its determination of baseline sites on landowner's self-surveys, which it claims were absent or spotty, (2) failed to account for the seasonal, foraging, and dispersal use of habitat in in establishing baseline sites, and (3) disregarded the agency's own guidance and policy in determining whether Spotted Owls occupied the site. Pl.'s Mot. Summ. J. 22.

The Court agrees with defendants that the FWS used the best techniques and information available. Def's Mot. Summ. J. 33. Plaintiff asserts that FWS relied on "absent or spotty" survey data and "unreliable" and "inaccurate" mapping data. Pl.'s Mot. Summ. J. 22-23. Specifically, FOA takes issue with the fact the FWS are not able to survey Spotted Owls on private timber land and identifies one site that had no survey data. Pl.'s Mot. Summ. J. 23.

As an initial matter, some of these arguments misconstrue the record. The

Court is not persuaded plaintiff's assertion that a site was missing survey data.  Pl.'s

Mot. Summ. J. 23.  Plaintiff relies on an email from a FWS employee that states that

> [t]here is a *potential* that one spotted owl site may not have 2015 data
> due to revocation of access permission for spotted owl surveys from
> another company.  If that happens, then we will have to look closely at
> the sites and the situation.  *We may not be able to include this in the
> nonbaseline without this year's surveys*[.]

*AR 004484* (emphasis added).  This portion of the record merely indicates that if FWS

finds one Spotted Owl site is missing survey data, it may not be able to consider the

site as non-baseline, in which case, the permit holder would not receive incidental

take authorization for that site.  The Court does not this as indication that FWS failed

to use "best available techniques and information."

The Court also is unconvinced by plaintiff's contention that FWS's utilization

of Spotted Owl survey data from private landowners violates Safe Harbor Policy by

failing to use the best techniques and information available.  Under the SHAs, the

FWS is granted access to the permittee's land to survey and remove Barred Owls.

*See AR 003304 (RRC/Oxbow).* However, to access data regarding Spotted Owl

presence, the SHA explains that

> [c]urrently, most of the spotted owl surveys are conducted under the
> Northwest Forest Plan and the FWS and USGS will access this data to
> track conditions on each spotted owl site. If RRC or Oxbow conducts
> surveys of spotted owls on the study area, FWS and USGS will have
> access to these data.

*AR 003304 (RRC/Oxbow).*

As previously discussed, nowhere does the Safe Harbor Policy require FWS to

monitor the effects of the SHA itself.  In fact, the policy specifically states that a SHA

Page 19 – OPINION AND ORDER

must "*identify* a schedule for monitoring and *the responsible parties who will monitor* maintenance of baseline conditions . . . and any incidental take[.]"  64 Fed. Reg. at 32,723 (emphasis added).  Thus, the policy requires the SHA to identify which party is responsible for monitoring baseline conditions and incidental take.  It does not require the FWS to monitor and survey or prohibit another entity from supplying the information to the FWS.  Moreover, the SHA policy allows the formulation of baseline conditions through incorporating information provided by the property owner, indicating survey data provided by a property owner can be sufficient to provide "best available techniques and information."  64 Fed. Reg. at 32,723.  Additionally, the administrative record supports that surveys represent the best available technique and information to make an informed decision.  *AR 003294-97 (RRC/Oxbow)* ("[We] have strong annual survey data for most of the area that may be included in the Safe Harbor Agreement"); *AR 002771-73 (Weyerhauser)*; *AR 001366 (ODF)*; *AR 003294-97 (RRC/Oxbow)*.  Thus, the Court rejects plaintiff's contention that the SHA's provision indicating that FWS will receive its monitoring data from private property owners, USFS, and USFS results in the FWS's failure to use the "best available techniques and information."  Accordingly, the SHA provision is not plainly erroneous or inconsistent with the regulation.

Finally, FOA claims the FWS failed to incorporate sites into its baseline designation despite the fact the stands met certain habitat criteria, indicating the stands could provide suitable habitat to Spotted Owls and should therefore be established as "baseline."  Pl.'s Mot. Summ. J. 22.  The Safe Harbor Policy allows

baseline conditions to be based on habitat or population or both.  64 Fed Reg at 32,719, 32,722.   Here, FWS specifically relied on demographic population surveys and uses Thiessen polygons to delineate territories in order to "define spotted owl sites within the treatment area." *AR 001366*.  Thus, the FWS primarily relied on population estimates and distribution rather than habitat characteristics in establishing baseline conditions.  Accordingly, the FWS's determination that a site was "non-baseline," despite it containing suitable habitat characteristics, is not "plainly erroneous or inconsistent" with the regulatory scheme.

1.    *FWS' Reliance on Resident Owl Populations, Rather than Seasonal, Foraging, and Dispersal Use of Habitat, When Establishing Baseline Sites Is Not Plainly Erroneous or Inconsistent with the Regulation.*

The Court does not adopt plaintiff's assertion that the FWS unlawfully failed to account for seasonal, foraging, and dispersal use of habitat when determining the baseline status of the sites.  The FWS establishes a site as "baseline" if "at least one resident spotted owl was detected." *AR 003294 (RRC/Oxbow)*; *AR 001367 (ODF)*; *AR 000019 (RRC)*; *AR 002771 (Weyerhauser)*.  However, if a Spotted Owl was observed in a site, and after investigation, was found to be merely passing through or using the site for seasonal, foraging, and dispersal, it was not included as an observation for purposes of establishing a baseline site. *AR 000254; AR 00462-64; AR 00160* ("If we have a single bird respond, particularly on a site that has been 'vacant'"to the best of our ability to detect for a few years, we look at the data and the notes of the surveyor to decide whether there is a good reason to think that the individual is not resident.").

Moreover, FWS contends the SHA guiding criteria aims to increase the population of resident owls. Def's Mot. Summ. J. 35. Thus, including various non-residential uses of habitat to determine Spotted Owl presence would not further the interest of finding locations where species currently inhabit to designate protections. Def's Mot. Summ. J. 35. The Court finds this rationale a reasonable explanation for FWS's calculation of baseline conditions and not plainly erroneous or inconsistent with the regulation.

Nevertheless, plaintiff asserts the SHAs' baseline calculation is unlawful because it only relies on resident spotted owl numbers, and therefore ignores the fact that sites without "residents" may still play an important role in their survival. Pl.'s Mot. Summ. J. 23-24. Plaintiff relies on the Safe Harbor Policy language defining "baseline conditions," which includes "population estimates and distribution and/or habitat characteristics and determined area of the enrolled property that sustain seasonal or permanent use by the covered species[.]" 64 Fed. Reg. at 32,722 (emphasis added). It also relies on Safe Harbor Policy language requiring baseline conditions to "identify habitat characteristics and determined area of the enrolled property that sustain seasonal and permanent use" to support its contention that seasonal, foraging, and dispersal use of habitat must be included in the determination of whether a site is established as "baseline" or "non-baseline." 64 Fed. Reg. at 32,723.

The plain language of the Safe Harbor Policy does not support plaintiff's reasoning for two reasons. First, the definition of baseline essentially allows the establishment of baseline conditions to be determined by "population estimates and

distribution" or "habitat characteristics."  As discussed, the SHAs at issue establish their baseline conditions on population estimates, determined by survey data indicating the presence of resident owls.  *AR 003294 (RRC/Oxbow)*, *AR 001367 (ODF)*; *AR 000019 (RRC)*; *AR 002771 (Weyerhauser)*.  Accordingly, the fact the SHA baseline only includes resident owls and does not incorporate observations of Spotted Owls that are using a particular area for foraging and dispersal use in its determination of baseline conditions, does not equate to a failure to "accurately identify the habitat characteristics and determined area of the enrolled property that [can] sustain seasonal or permanent use."

Second, the policy's mandate to consider and assess seasonal use was specifically accounted for in the SHAs at issue and provided additional protections for such seasonal use:

> To support the Barred Owl Removal Experiment, ODF will . . . [m]aintain habitat in the 70 acre core area to support nesting spotted owls that may reoccupy non-baseline sites and other areas outside of baseline (i.e. baseline and elevated baseline) Thiessen polygons during the nesting and rearing season (March 1 to September 30 of the year). The intent is to allow spotted owls that initiate nesting to complete nesting and fledge young. The configuration of the 70 acre core habitat to be maintained will be determined with the technical assistance of the FWS, based on the best habitat associated with nesting and roosting locations. \

*AR 003298 (RRC/Oxbow); AR 000024 (RRC); AR 0027778 (Weyerhauser)*. Accordingly, FWS's consideration of permanent and seasonal use was sufficient for determining baseline conditions.  The fact the FWS did not include foraging and dispersal use of habitat in whether a site was "occupied" for the purpose of establishing baseline conditions was not clearly erroneous or plainly inconsistent

with the policy.

2.    *FWS Did Not Disregard Its Own Guidance and Policy in Determining
      Whether a Spotted Owl Occupied the Site.*

Finally, plaintiff asserts that FWS erred in determining a site was non-baseline when it had not detected a Spotted Owl in the three to five years because negative surveys are insufficient to establish "abandonment" of the site. Pl.'s Mot. Summ. J. 26. Instead, plaintiff claims the policy mandates the sites be categorized as "unoccupied" and still receive some protection under the SHA. Pl.'s Mot. Summ. J. 26. Despite plaintiff citations to the record, the Court finds no substantive support for its claims. The record explains that "occupancy is an annual rate and is not equivalent to 'abandoned,' which is a permanent status" and the "Service does not concur that the sole use of 3 years of protocol surveys is appropriate to determine permanent abandonment of historic Spotted Owl sites." *AR 01568-70.*

Though the record supports plaintiff's assertion that "abandonment" classification based on three years of surveys is insufficient, nowhere in the SHA does FWS mention sites were "abandoned," exclusively referring to sites as "unoccupied" if a Spotted Owl had not been observed in three or five years. *AR 001373 (ODF); AR 003301 (RRC/Oxbow), AR 000027 (RRC), AR 002777 (Weyerhauser).* Further, FWS does provide additional protections to unoccupied sites if they did become reoccupied by nesting Spotted Owl pairs. *Id.; see e.g. AR 002777 (Weyerhauser)* ("If currently unoccupied spotted owl sites in the Study Area are re-occupied by spotted owl pairs and those pairs initiate nesting, Weyerhaeuser will alter harvest unit configurations and potentially harvest scheduling necessary to maintain sufficient habitat in a 70-

acre core, designated based on the "nearest, best most contiguous habitat.").

Thus, FWS was not arbitrary and capricious or plainly inconsistent with regulation in its determination of baseline cites.

D.    *The FWS Did Not Fail to Disclose and Reasonably Analyze the SHA's Effects on Critical Habitat.*

Plaintiff also asserts that FWS failed to consider the cumulative impact of the incidental take authorization on federal land and failed to establish whether Section 7 consultation is required for permittees' activities on federal easements.  Pl.'s Opp'n to Def.'s Mot. Summ. J. 24.   FWS claims a Section 7 consultation is unnecessary because the SHAs and Permits have no anticipated no effect to critical habitat since the Permits do not authorize take on areas designated as critical habitat.  Def.'s Mot. Summ. J. 35.

Plaintiff claims FWS failed to analyze the impacts of private logging on federal land in affected areas as part of a cumulative effects analysis.  Pl.'s Mot. Summ. J. 28.  Plaintiff chiefly relies on the fact FWS had to revise its draft EA to address the SHAs effects on Spotted Owl critical habitat, but instead issued addenda for each SHA that stated the SHA would have no impact without explanation.  Pl.'s Mot. Summ. J. 28.  This was error, plaintiff argues, because it ignores the private landowners' activities on state and federal land that may affect critical habitat.  Pl.'s Mot. Summ. J. 28-29.

However, the administrative record includes no evidence of permits or planned activities on behalf of the private landowner that would affect state or federal critical habitat.  The Court does not find support for plaintff's assertion that the Roseburg

Oxbow SHA lists sections located on State ODF land that overlaps with critical habitat. Thus, the only the SHA affected to have any impact on critical habitat is the ODF SHA, which prompted the FWS to revise its Bi Op to reassess and address such impacts and determine the permit would not likely adversely affect critical habitat. *AR 001476-80* ("That low level of potential loss would not impair the overall recovery of the spotted owl at the Range wide, Zone or Unit level or possibly might not even be detectable, particularly at the less than one-half of one percent level.").

Plaintiff, however, contends the Bi Op assessing the SHAs' effects on ODF lands is also flawed because it does analyze the foraging, transience, and colonization value of the affected critical habitat. Pl.'s Mot. Summ. J. 31. This is not the case. The Bi Op does consider and assesses the foraging, transience, and colonization value of the affected critical habitat, but nevertheless determined that it would not adversely affect Spotted Owls because the loss of critical habitat would be scattered, avoiding hinderance on a Spotted Owl's ability to safely travel across its habitat. *AR 001466* ("These stands typically do not provide high-quality spotted owl habitat, although they may occasionally be used for foraging and dispersal."); *AR 001471* ("ODF uses different habitat data in their internal analysis of their actions which includes foraging and some dispersal habitat as potentially suitable spotted owl habitat."); *AR 001479* ("[T]he scattered nature of ODF lands mean that any habitat loss would not appreciably affect the north-south connectivity between subunits."). Because no adverse impact to critical habitat was identified, FWS did not conduct a formal Section 7 consultation, which is reserved for actions that may affect listed

species or critical habitat. 50 C.F.R. 402.12.

Thus, the Court holds that FWS did not violate the ESA and sufficiently analyzed the SHA's effects on critical habitat.

II.    *NEPA*

A.    *FWS Did Not Fail to Supplement Its Final EIS in Violation of NEPA.*

Plaintiff asserts FWS violated NEPA by failing to prepare and circulate a supplement to the 2013 EIS because (1) FWS never emphasized in the 2013 FEIS that nonfederal landowner participation was "crucial" to the experiment, Compl. ¶ 4; (2) the FEIS does not disclose that SHAs and Permits will authorize habitat destruction, Pl.'s Mot. Summ. J. 32-33; Pl.'s Opp'n to Def.'s Mot. Summ. J. 29; and (3) the Permits and SHAs must be discussed together in one EIS because they are connected agency actions. Pl.'s Mot. Summ. J. 33; Pl.'s Opp'n to Def.'s Mot. Summ. J. 30.

The U.S. Forest Service's decision not to prepare an Supplemental EIS is reviewed under the arbitrary or capricious standard. *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 853 (9th Cir. 2013) (citing *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1044 (9th Cir.2011), *cert. denied*, 566 U.S.1010, 132 S. Ct. 2439, 182 L.Ed.2d 1063 (2012).

Agencies must prepare supplements to a final environmental impact statements if the agency makes substantial changes in the proposed action that are relevant to environmental concerns.   40 C.F.R. § 1502.9c)(1)(i). "Whether new information requires supplemental analysis is a 'classic example of a factual dispute

the resolution of which implicates substantial agency expertise.'" *Cascadia Wildlands v. Carlton*, 341 F. Supp. 3d 1195, 1202 (D. Or. 2018) (*quoting Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012).

"[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized.  To require otherwise would render agency decision-making intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal footnote omitted).

1.    *FWS Did Not Fail to Supplement the EIS Merely Because It Did Not Characterize Nonfederal Landowners' Participation in the Experiment as "Crucial."*

Plaintiff claims a supplemental analysis is necessary because FWS did not mention landowner participation in the experiment was "crucial" and only considered the "potential economic effect" the experiment might have on timber harvests from state and private lands.  Compl. ¶ 4.  Specifically, FOA argues the "expansion" of the experiment onto nonfederal land was not anticipated in the 2013 FEIS and is substantial because it authorizes incidental take across "a whopping 11,550 acres . . . of high-value nesting/roosting habitat[.]"  Pl.'s Mot. Summ. J. 32.

The 2013 EIS accounted for the possibility that nonfederal lands could be included in the experiment. *AR 016409* ("Where possible, we would seek cooperation from nonfederal landowners."); *AR 016619* ("All study areas contain at least some nonfederal lands.").  Though plaintff concedes that the 2013 EIS mentions the potential of utilizing nonfederal law, it contends that a supplemental EIS is

nevertheless required because the EIS never mentioned cooperation from nonfederal lands was "crucial" to the experiment.  Compl ¶ 4-5.

FWS did not emphasize the need as "crucial" in the EIS, but it nevertheless contemplated the value of nonfederal lands and included it in every alternative.  *AR 016625-30* (showing all alternatives in the EIS contemplated nonfederal land participation).  Accordingly, the Court finds no occasion to require a supplemental analysis merely because the agency did not describe nonfederal landowner cooperation as "crucial."  *See Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445, 472 (9th Cir. 2016) ("[T]he FEIS already accounts for the noise and light impacts of possible nighttime construction: This analysis considered both daytime and nighttime construction activities using the procedures and criteria for a general noise assessment.").

Plaintiff also asserts the SHAs and Permits authorize habitat destruction, which constitutes a substantial change requiring a supplemental analysis.  Pl.'s Mot. Summ. J. 32-33; Pl.'s Opp to Def Mot. Summ. J. 29.  Plaintiff misconstrues the authorization contained in the SHA and associated Permit.  As previously discussed, the SHA and Permits in this case merely exempt incidental take on sites that have not had a presence of Spotted Owl in the last three or five years. *AR 001350 (ODF); AR 003286 (RRC/Oxbow); AR 000009 (RRC); AR 002762 (Weyerhaeuser).* Accordingly, absent permit issuance, the private landowners would nevertheless be able to continue their activities on the sites permitting incidental take because no listed species would be present.  64 Fed. Reg. 32,724 ("If the property owner carried

out the management actions and complied with the permit and the Agreement conditions, the property owner would be authorized to use the property in any manner that does not result in moving the enrolled property to below baseline conditions."); *also see Id.* at 32,725 ("If the Services conclude that a significant impact could occur, the issuance of a permit would require preparation of an EA or EIS, although the Services believe that the need for an EIS will be rare."). Thus, authorizing incidental take for a landowners otherwise lawful activities on those sites does not constitute a substantial change relevant to environmental concerns.

Finally, plaintff argues that the Permits and SHAs are all connected actions contributing to the experiment and should therefore be discussed together in one EIS. Pl.'s Mot. Summ. J. 33. Plaintiff relies on 40 CFR 1502.4(a), requiring agencies to discuss connected actions in same EIS if one action will not proceed unless other actions are taken previously or simultaneously and are interdependent parts of a larger action, depending on the larger action for their justification. Pl.'s Mot. Summ. J. 33. The mandate, plaintiff argues, was violated by FWS knowingly subdividing its NEPA analysis of the SHAs when the they were are all dependent on the larger owl removal experiment. Pl.'s Mot. Summ. J. 33-34. FOA reasons that separate analyses are inappropriate where, as here, nonfederal landowner participation is part of a coordinated effort and are not separate applicants applying for a permit. Pl.'s Mot. Summ. J. 34 ("While this may have been excusable if Permittees had indeed approached FWS one-by-one over the course of the year requesting to enter into SHAs, that was not the case.").

In defense, FWS states the permits are separate, independent agency actions with different legal purposes and effects, which are supported by their own NEPA documentation—the EAs and FONSIs.  Def Reply in Supp. of Mot. Summ. J. 20.

Under 40 C.F.R. § 1502.4, agencies must "properly define" the proposal that the environmental impact statement assesses.  The regulatory section directs agencies to adhere to regulatory criteria in § 1508.25 to determine whether proposals are related to each other to the extent it must be evaluated in a single impact statement.  40 C.F.R. § 1502.4.

Turning to those criteria, plaintiff argues that the 2013 FEIS and contested SHAs and Permits are "connected" actions. Actions are "connected" if they:

  i.  Automatically trigger other actions which may require environmental impact statements.
 ii.  Cannot or will not proceed unless other actions are taken previously or simultaneously.
iii.  Are interdependent parts of a larger action and depend on the larger action for their justification.

*Id.* § 1508.25(a)(1). However, if "one of the projects might reasonably have been completed without the existence of the other, the two projects have independent utility and are not 'connected' for NEPA's purposes." *Pac. Coast Fed'n of Fishermen's Associations v. Blank*, 693 F.3d 1084, 1097–98 (9th Cir. 2012) (*quoting Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir.2006) ("The crux of the [independent utility] test is whether each of two projects would have taken place with or without the other . . . .").

While the 2013 FEIS and SHAs and Permits are all linked to Action 29 and the Barred Owl removal experiment, the two actions are not necessarily "connected"

as defined by the regulatory criteria.  Here, each SHA and Permit seek to obtain information and data to determine whether the Barred Owl removal experiment is an effective means of promoting Spotted Owl recovery.  Though each action benefits the experiment by contributing data, each action could exist without the other.  *See Pac. Coast Fed'n of Fishermen's Associations*, 693 F.3d at 1097–98 ("[T]wo actions are not connected simply because they benefit each other or the environment."); *NW. Res. Info. Ctr. v. NMFS*, 56 F.3d 1060, 1068–69 (9th Cir.1995) (two actions were not connected merely because they both would benefit salmon); *Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394, 400 (9th Cir.1989) ("[E]ach [action] could exist without the other, although each would benefit from the other's presence.").

Moreover, the EA and FONSI for each SHA and Permit assesses the cumulative impacts of other nonfederal SHAs and Permits, which diminishes the concern that that FWS is diluting the environmental impacts of each action.  *See AR 000069-72 (RRC); AR 001411-13 (ODF); AR 002804-807 (Weyerhauser); AR 003338-39 (RRC/Oxbow)* ("[T]o ensure a robust NEPA analysis, we have added a discussion of the two Safe Harbor Agreements that are currently under discussion."); *also see Pac. Coast Fed'n of Fishermen's Associations*, 693 F.3d at 1099.

For the reasons stated above, the Court holds supplementation of the 2013 FEIS is not necessary.

**CONCLUSION**

Plaintiff's Motion for Summary Judgment (doc. 55) is DENIED. Defendants' Cross Motion for Summary Judgment (doc. 56) is GRANTED.  Accordingly, this case

is dismissed.

IT IS SO ORDERED.

Dated this  15th  day of January 2021.


_____ /s/Ann Aiken _____
Ann Aiken
United States District Judge